UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JACK GALARDI, et al.,                    :

     Plaintiffs,                          :
                                  CIVIL ACTION NO.
v.                                       :
                                  1:09-CV-965-AT
CITY OF FOREST PARK, et al.,             :

     Defendants.                          :

## ORDER

This action is before the Court on defendants' motions to dismiss plaintiffs'

Amended Complaint [79, 80]; defendants' motion to dismiss or, in the alternative,

motion to strike plaintiffs' Second Amended Complaint [101]; plaintiffs' motion

for leave to file Second Amended Complaint [106]; and plaintiffs' motion to

supplement their response to defendants' motion to dismiss [124].[1]  For the

following reasons, the Court grants the individual defendants' motion to dismiss,

grants in part and denies in part the City of Forest Park's motion to dismiss, grants

---

[1] After this order was prepared and ready for filing, defendants filed a supplemental
motion to dismiss in which they argue that plaintiffs no longer have standing to pursue any of
their claims because they no longer have adult entertainment licenses.  Due to the late filing of
this motion, the Court declines to address this standing argument at this time.  The Court will
conduct a status conference after entry of this order to address this issue.

defendants' motion to strike plaintiffs' Second Amended Complaint, denies plaintiffs' motion for leave to file an amended complaint, and denies as moot plaintiffs' motion to supplement their response to defendants' motion to dismiss.

Background

Plaintiffs own and operate two adult entertainment establishments, the Crazy Horse Saloon and the Pink Pony South, located within the City of Forest Park, Georgia (the "City").[2]   On March 23, 2009, the City passed a new adult entertainment ordinance ("2009 Ordinance"), which included  prohibitions on nudity and the sale or consumption of alcohol at adult entertainment establishments.

On April 10, 2009, plaintiffs filed this action against the City and various City officials challenging the constitutionality of certain provisions of the 2009

_____

[2] According to the Amended Complaint, the Crazy Horse Saloon is operated by plaintiff Red-Eyed, Inc., on property owned by plaintiff Walleye, LLC, while the Pink Pony South is operated by plaintiff Mia Luna, Inc., on property owned by plaintiff JGP&P, LLC. Am. Compl., The Parties ¶¶ 1-5.  Plaintiff Jack Galardi is alleged to be the major stockholder in "both" corporations, presumably referring to Red-Eyed and Mia Luna. *Id.* ¶ 6. Defendants contend that plaintiffs Galardi, Walleye, and JGP&P lack standing because they are not alleged to have suffered any injury and are merely seeking to enforce the rights of Red-Eyed and Mia Luna. However, the precise relationship among the various plaintiffs and the actual ownership of the two businesses remains unclear.  Therefore, the Court will not address this issue at this time. For purposes of the pending motions, the Court will treat plaintiffs collectively as the owners/operators of the two adult entertainment establishments at issue.

2

Ordinance, including the ban on nudity and alcohol.  On May 14, 2009, the parties entered into a Joint Stipulation under which the City agreed not to enforce the challenged provisions against plaintiffs until the conclusion of this litigation. Subsequently, the Court granted a series of consent motions staying all proceedings while the parties attempted to reach a settlement agreement.  These efforts were not successful.

On March 9, 2010, the City passed another new adult entertainment ordinance ("2010 Ordinance").  The 2010 Ordinance repealed the 2009 Ordinance but reenacted many of the same provisions, including the ban on nudity and alcohol.  The Court subsequently granted plaintiffs leave to file an Amended Complaint challenging the 2010 Ordinance and stayed discovery until after ruling on any dispositive motions filed by defendants.  Order of Oct. 7, 2010.

By letter dated October 22, 2010, defendants notified plaintiffs that the City would begin enforcing the 2010 Ordinance on January 1, 2011.[3]  In response, plaintiffs filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin enforcement of the 2010 Ordinance.  Plaintiffs argued

---

[3] By its terms, the parties' previous stipulation requiring the City to refrain from seeking enforcement of the challenged provisions against plaintiffs applied only to the 2009 Ordinance.

3

that the purported purpose of the ordinance – to combat negative secondary effects of adult entertainment establishments – was supported by "shoddy" evidence, and that the City's investigation of such effects was an "absolute sham."  Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. at 7.

Pursuant to *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002),[4] the Court directed defendants to submit the record on which the City relied in adopting the 2010 Ordinance.  Order of Nov. 18, 2010.  After reviewing the record, the Court determined that defendants had met their initial burden of establishing that the 2010 Ordinance furthers the substantial governmental interest in reducing the secondary effects associated with adult businesses.  The Court ordered plaintiffs to respond with any evidence that cast doubt on defendants' "secondary effects" evidence.  Order of Dec. 3, 2010.  After reviewing plaintiffs' evidence, the Court found that plaintiffs had cast doubt on whether the City

---

[4] *Alameda Books* established a burden-shifting scheme for determining whether a municipality, in enacting an ordinance to address the secondary effects of protected speech, relied on evidence "demonstrating a connection between speech and a substantial, independent government interest."  535 U.S. at 438 (citations omitted) (plurality opinion).  First, the municipality must produce evidence that "fairly support[s] the municipality's rationale for its ordinance."  *Id.*  The plaintiffs must then come forward with evidence that "cast[s] direct doubt on this rationale."  *Id.*  If plaintiffs produce such evidence, "the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance."  *Id.* at 439 (citation omitted).

4

adequately considered the local secondary effects in Forest Park and directed defendants to respond to plaintiffs' evidence. Order of Dec. 16, 2010. Defendants responded on December 24, 2010, and subsequently filed additional evidence supporting its rationale.

After reviewing all of the evidence submitted, on January 13, 2011, the Court entered an Order denying plaintiffs' motion for a temporary restraining order and preliminary injunction on the grounds that plaintiffs had failed to establish a substantial likelihood of success on the merits. The Court found that the City had presented evidence supporting its rationale for enacting the 2010 Ordinance, including the testimony of three experts hired by the City who made presentations on negative secondary effects of adult entertainment establishments, affidavits from former employees of plaintiffs documenting criminal and inappropriate conduct at plaintiffs' establishments, and numerous studies from other locations on the negative secondary effects of adult entertainment establishments. Order of Jan. 13, 2011, at 15. Plaintiffs had cast doubt on some of this evidence through expert opinion, but they left unchallenged twenty-one studies and three former employee affidavits. *Id.* at 16.

5

Noting that "[t]he ultimate inquiry is whether the City's rationale 'was a reasonable one, and even if [the plaintiff] demonstrates that another conclusion was also reasonable, we cannot simply substitute our own judgment for the City's,'" the Court concluded that "Plaintiffs have simply not made a showing that there is a substantial likelihood of success that the City's rationale was unreasonable." *Id.* at 17 (quoting *Flanigan's Enters., Inc. of Ga. v. Fulton Cnty., Ga.*, 596 F.3d 1265, 1279 (11th Cir. 2010) ("*Flanigan's II*")). Plaintiffs subsequently appealed the Court's denial of preliminary injunctive relief pursuant to 28 U.S.C. § 1292(a)(1).[5]

While plaintiffs' motion for preliminary injunctive relief was pending, the individual defendants and the City filed separate motions to dismiss the Amended Complaint. In response, plaintiffs filed a brief in opposition to the City's motion together with a Second Amended Complaint. Defendants then moved to dismiss or, in the alternative, to strike the Second Amended Complaint on the grounds that plaintiffs had failed to obtain leave of court to file it, and that such leave should not

---

[5] Plaintiffs' appeal does not deprive this Court of jurisdiction to address the pending motions. *See* 16 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3921.2 at 53 (2d ed. 1996) ("Ordinarily an interlocutory injunction appeal under § 1292(a)(1) does not defeat the power of the trial court to proceed further with the case.").

6

be granted.  Plaintiffs filed a brief in opposition to that motion, arguing that they were not required to obtain leave of court to file the Second Amended Complaint. In the alternative, plaintiffs moved for leave to file the Second Amended Complaint.

Discussion

I.      Defendants' Motion to Dismiss or Strike Second Amended Complaint
        and Plaintiffs' Motion for Leave to File An Amended Complaint

The Court first addresses plaintiffs' attempt to file a Second Amended Complaint.  Plaintiffs contend they were entitled to file the Second Amended Complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1)(B), but if the Court concludes otherwise, that the Court should grant them leave to file it. Defendants contend that the Second Amended Complaint should be dismissed or stricken because plaintiffs were not entitled to file it as a matter of course, and that the Court should deny leave to file it because of plaintiffs' undue delay and lack of diligence in seeking the amendment.  The Court concludes that plaintiffs were not entitled to file their Second Amended Complaint as a matter of right, and that leave to file the Second Amended Complaint must be denied.

7

Plaintiffs' original complaint was filed on April 10, 2009, and defendants served their answer on May 5, 2009. At that time, Rule 15 of the Federal Rules of Civil Procedure provided that a plaintiff could amend his complaint once as a matter of course "before being served with a responsive pleading." *See* Former Fed. R. Civ. P. 15(a)(1)(B). Therefore, under the rule then in effect, plaintiffs' right to amend their complaint as a matter of course terminated on May 5, 2009, with the service of defendants' answer.

Effective December 1, 2009, Rule 15 was amended to provide that a plaintiff could amend his complaint once as a matter of course within 21 days after service of either a responsive pleading or a motion to dismiss, "whichever is earlier." Fed. R. Civ. P. 15(a)(1)(B). By the time this rule took effect, plaintiffs' right to amend their complaint as a matter of course had been terminated for more than six months. Even if the current rule had been in effect at the time this action was filed, by its plain terms, it would have extended plaintiffs' time to file an amended complaint as a matter of course by only 21 days from the date of service of defendants' answer, or until May 26, 2009. Clearly, therefore, plaintiffs' Second Amended Complaint, which was not filed until December 8, 2010, was not properly filed as a matter of course under Rule 15(a)(1)(B) as plaintiffs contend.

8

Since plaintiffs did not have the right to file their Second Amended Complaint, the Court must determine whether they should be granted leave to do so. Generally, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "when a motion to amend is filed after the court has issued its scheduling order, the movant must first demonstrate good cause under Rule 16(b) before the court considers the amendment's propriety under Rule 15(a)." *Bowers v. Am. Heart Ass'n, Inc.*, 513 F. Supp. 2d 1364, 1367 (N.D. Ga. 2007). "This good cause standard precludes modification [of the scheduling order] unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (quoting Advisory Committee Notes to 1983 Amendment of Rule 16); *see also Romero v. Drummond Co.*, 552 F.3d 1303, 1319 (11th Cir. 2008) ("To establish good cause, the party seeking the extension must have been diligent.").

A scheduling order, as set out in the parties' Joint Preliminary Report and Discovery Plan ("JPRDP"), was entered in this case on July 21, 2009. It provided that "Amendments to the pleadings submitted LATER THAN THIRTY (30) DAYS after the preliminary planning report is filed, or should have been filed, will

9

not be accepted for filing, unless otherwise permitted by law." JPRDP ¶ 6(b) (emphasis in original). After the City enacted the 2010 Ordinance on March 8, 2010, defendants consented to plaintiffs' filing an amended complaint to challenge the newly enacted ordinance, and the Court granted plaintiffs' motion for leave to file their Amended Complaint on October 7, 2010. More than two months later, after defendants had moved to dismiss their Amended Complaint, plaintiffs filed their Second Amended Complaint. The Second Amended Complaint incorporates by reference both plaintiffs' original Complaint and Amended Complaint, although it omits a number of the causes of action contained in those complaints. It also adds a number of new allegations and asserts several new causes of action.

Plaintiffs offer no explanation for their delay in seeking to add the new allegations and causes of action contained in the Second Amended Complaint. They had more than six months from the City's adoption of the 2010 Ordinance on March 8, 2010, until they submitted their proposed Amended Complaint on September 21, 2010, to research the facts and the law. Indeed, since plaintiffs contend that the 2010 Ordinance is virtually identical to the 2009 Ordinance, it is difficult to understand why, more than a year-and-a-half after the original

10

complaint was filed challenging the 2009 Ordinance, plaintiffs are seeking to amend their complaint for the second time to add new allegations and claims.

Plaintiffs have failed to show, or even attempt to show, that they have been diligent. There is no contention that plaintiffs were previously unaware of the facts and claims they now seek to add to their complaint, or that they could not have been discovered if plaintiffs had acted diligently. Contrary to plaintiffs' contention, defendants will clearly be greatly prejudiced if the Second Amended Complaint is allowed to be filed, as they will be forced to defend, more than two years after this action was first filed, new allegations and claims that could and should have been asserted at least by the time the Amended Complaint was filed.

In the absence of any showing of diligence, plaintiffs have clearly failed to establish the requisite good cause for permitting the filing of their Second Amended Complaint. Accordingly, the Court denies plaintiffs' motion for leave to file an amended complaint and grants defendants' motion to strike the Second Amended Complaint.

II.     Individual Defendants' Motion to Dismiss

The individual defendants move to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim against them upon

which relief can be granted.  First, Forest Park Mayor Corrine Deyton, City Manager John Parker, and Chief of Police Dwayne Hobbes argue that they are entitled to dismissal of the individual capacity claims against them because plaintiffs have pled no facts concerning them and they were not responsible for enactment of the 2010 Ordinance about which plaintiffs complain.  Second, the other individual defendants, members of the Forest Park City Council, argue that they are entitled to dismissal of the individual capacity claims against them on grounds of legislative immunity, qualified immunity, official immunity, and statutory immunity under O.C.G.A. § 51-1-20(a).  Finally, all of the individual defendants argue that plaintiffs' official capacity claims against them are redundant and should be dismissed because the City is also named as a defendant.

Plaintiffs have filed no response to the individual defendants' motion to dismiss.  It is therefore deemed to be unopposed.  LR 7.1B, NDGa.  The Court concludes that the individual defendants are entitled to dismissal of all claims against them on the grounds stated in their motion.

III.    City of Forest Park's Motion to Dismiss

In a separate motion under Fed. R. Civ. P. 12(b)(6), the City of Forest Park contends that the Amended Complaint also fails to state a claim against it upon

which relief can be granted.  In their response to the City's motion, plaintiffs have

abandoned most of their claims.  Plaintiffs have expressly abandoned their federal

equal protection and substantive due process claims,[6] their Georgia substantive due

process claim,[7] their federal Commerce Clause and ex post facto claims, their

federal and Georgia Takings Clause and Contracts Clause claims, and their state

law claims for intentional infliction of economic harm and breach of contract.  In

addition, by failing to respond to defendant's arguments, plaintiffs have abandoned

their claims for declaratory relief and for punitive damages.  The only remaining

claims to be addressed are plaintiffs' First Amendment claim, their procedural due

process claims, and their state law claim for tortious interference with business

relations.

_____

[6] Plaintiffs admit that analysis of the 2010 Ordinance under the Equal Protection Clause and the substantive component of the Due Process Clause "is foreclosed . . . by the First Amendment analysis." Pls.' Resp. Br. at 18.  Despite half-hearted arguments that these claims should nevertheless be preserved, the Court construes this admission as express abandonment.

[7] The Court construes plaintiffs' statement that they "will not proceed with this cause of action at this stage"as express abandonment of this claim despite their unsupported request that the claim not be dismissed. Pls.' Resp. Br. at 21.

A.      Standard of Review

When reviewing a claim pursuant to a Rule 12(b)(6) motion, the Court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff.  *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1262 (11th Cir. 2004).  While the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted).  Instead, the complaint must set forth factual allegations "plausibly suggesting (not merely consistent with)" a violation of the law.  *Id*. at 557; *see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 n.43 (11th Cir. 2008).

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937,  1949 (2009)(quoting *Twombly*, 550 U.S. at 570).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 1950 (citation

14

omitted).  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

B.    Scope of Review

Where matters outside the pleadings are presented to and not excluded by the Court, a Rule 12(b)(6) motion must be treated as a motion for summary judgment under Rule 56, and the parties must be given a reasonable opportunity to present all materials pertinent to the motion.  Fed. R. Civ. P. 12(d).  "However, where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."  *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citation omitted).  In addition, the Court is "authorized at the motion to dismiss stage to take judicial notice of relevant public documents. . . ."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).

15

In this case, plaintiffs have attached to the Amended Complaint a copy of the 2010 Ordinance together with the minutes of the city council meeting where the ordinance was adopted, as well as a copy of the 2009 Ordinance and the minutes of the city council meeting where that ordinance was adopted, a copy of the agenda of the city council meeting held on February 15, 2010, and a copy of the previous adult entertainment ordinance adopted in 1997 (the "1997 Ordinance").  Am. Compl., Exs. A-F.  In addition, the City has attached to its motion to dismiss a certified copy of the minutes of a city council meeting held on July 21, 2009, and materials presented to the city council at that meeting relating to the secondary effects of adult entertainment establishments.  Mot. to Dismiss, Exs. A & B.[8]  These materials were considered by the city council in adopting the 2010 Ordinance and are referenced in the ordinance as the basis for the city council's findings regarding secondary effects.  2010 Ordinance § 9-12-1.  All of these attachments are both referred to in the Amended Complaint and are matters of public record.  As a result, the Court's consideration of these materials does not

---

[8] The City has also attached certified copies of the 2010 Ordinance and the minutes of the city council meeting where it was adopted.  Mot. to Dismiss, Exs. C & D.

require conversion of the City's motion to dismiss into a motion for summary judgment.

However, as noted above, in connection with the Court's consideration of plaintiffs' motion for preliminary injunctive relief, both plaintiffs and defendants submitted additional evidence regarding secondary effects. If the Court were to consider this evidence, it would be required to convert the motion to dismiss into one for summary judgment pursuant to Fed. R. Civ. P. 12(d). Upon review, the Court concludes that the motion to dismiss may be decided on the pleadings, and the Court excludes from consideration the additional evidence submitted by plaintiffs and the City in connection with plaintiffs' motion for preliminary injunctive relief. The Court's review shall be limited to the Amended Complaint together with the attachments thereto and the attachments to the City's motion to dismiss, including the materials relating to secondary effects considered by the Forest Park City Council in adopting the 2010 Ordinance.

C.    First Amendment Claims

Plaintiffs raise several challenges under the First Amendment. First, plaintiffs argue that the ordinance is a content-based restriction subject to strict scrutiny. Second, plaintiffs contend that even if the ordinance is construed as

17

content-neutral and subject only to intermediate scrutiny, it is still unconstitutional because it is not supported by reasonable evidence of adverse secondary effects and is not narrowly tailored to serve a legitimate governmental interest. Third, plaintiffs allege that the 2010 Ordinance fails to provide for adequate alternative avenues of communication. Finally, they contend that the ordinance operates as an unconstitutional prior restraint by granting City officials unbridled discretion to discriminate against speech based on its content. The Court reviews each of these claims to determine whether the Amended Complaint contains factual allegations "plausibly suggesting" a violation of the law.

> 1.    Strict Scrutiny

To the extent plaintiffs argue that the 2010 Ordinance creates content-specific restrictions and that strict scrutiny should therefore apply, they are incorrect. As the Court has previously held, "[b]ecause the City's purpose in enacting the adult entertainment ordinance is 'combating the harmful secondary effects of that conduct on the surrounding community,' the ordinance is content-neutral for scrutiny purposes" and therefore "is entitled to intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968)." Order of Jan. 13, 2011, at

AO 72A
(Rev.8/82)

13 (quoting *Fly Fish, Inc. v. City of Cocoa Beach, Fla.*, 337 F.3d 1301, 1306 (11th Cir. 2003)).

> 2.      Intermediate Scrutiny

Under the *O'Brien* test,

> ordinances that incidentally impact protected expression should be upheld if they (1) are within the constitutional power of the government to enact; (2) further a substantial governmental interest; (3) are unrelated to the suppression of free expression; and (4) restrict First Amendment freedoms no greater than necessary to further the government's interest.

*Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla.*, 337 F.3d 1251, 1264 (11th Cir. 2003) ("*Peek-A-Boo I*") (citations omitted).

> a.  Within Constitutional Power

The 2010 Ordinance easily satisfies *O'Brien*'s first prong.  Reducing the adverse secondary effects of adult businesses "is clearly within the city's police powers to protect public health and welfare."  *Flanigan's Enters., Inc. of Ga. v. Fulton Cnty., Ga.*, 242 F.3d 976, 984 (11th Cir. 2001) ("*Flanigan's I*") (citation omitted).   The 2010 Ordinance states that its purpose is to combat adverse secondary effects of adult entertainment establishments without infringing on constitutionally protected rights of free expression: "The purpose and intent of this

19

chapter is to address and forestall those negative secondary effects in the City of Forest Park, Georgia within the permissible limits and parameters of the Georgia and United States constitutions."  2010 Ordinance § 9-12-1.  This statement of purpose is sufficient to satisfy the first prong of the *O'Brien* test.  *See Flanigan's II*, 596 F.3d at 1277-78.  Whether the ordinance is reasonably designed to serve that purpose is a question to be addressed under the second prong.  *Id.* at 1278.

### b.  Furthers a Substantial Governmental Interest

Under *O'Brien*'s second prong, the City must demonstrate that the 2010 Ordinance furthers the City's "substantial interest in preventing secondary effects associated with adult entertainment establishments."  *Peek-A-Boo I*, 337 F.3d at 1269.  To this end, "a city need not 'conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'"  *Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F.3d 860, 875 (11th Cir. 2007) (quoting *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring in the judgment)).  However, the City "cannot rely on 'shoddy data or reasoning' and its 'evidence must fairly support [its] rationale.'"  *Peek-A-Boo I*, 337 F.3d at 1269 (quoting *Alameda Books*, 535 U.S. at 438 (plurality opinion)).

In enacting the ordinance at issue in this case, the City expressly relied upon a voluminous amount of evidence relating to adverse secondary effects of adult entertainment establishments. This evidence included (1) decisions of the Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court in cases involving adult entertainment ordinances; (2) affidavit and other written evidence of criminal activity, improper conduct, and other adverse secondary effects in adult entertainment establishments operated in the City of Forest Park during the previous ten years; (3) studies of adverse secondary effects of adult entertainment establishments in numerous other communities around the country; (4) a presentation and accompanying report by Dr. Richard McCleary, a professor of criminology at the University of California at Irvine and an expert in crime-related effects of sexually oriented businesses, detailing the criminal activities and other adverse secondary effects of adult entertainment businesses, explaining the criminological theories supporting ties between adult entertainment and criminal activity, and documenting evidence of the adverse secondary effects of adult entertainment establishments; (5) a presentation and accompanying report by Connie Cooper, an expert in planning and community development, detailing the adverse secondary effects of adult entertainment establishments in the areas of

planning and development and property values; (6) a presentation and report by private investigator Guy Watkins of BCI, Inc., detailing the findings and observations of private investigators who had recently visited adult entertainment establishments in the nearby city of Sandy Springs, Georgia, finding evidence of criminal activity, including crimes of assault and prostitution; (7) transcripts of meetings of the Sandy Springs City Council documenting extensive evidence of adverse secondary effects of adult entertainment; (8) special reports relating to the secondary effects of adult entertainment establishments on real property values in Fort Worth and Dallas, Texas, and Palm Beach County, Florida; (9) documents relating to the prosecution of a Fulton County police lieutenant for accepting money, sex, food, and services from an adult entertainment establishment in exchange for "protection"; and (10) reports by BCI investigators relating to adult bookstores and adult cabarets in Sandy Springs. 2010 Ordinance § 9-12-1; Mot. to Dismiss, Ex. A.

The voluminous evidence on which the City relied goes well beyond the "very little evidence" required under *Alameda Books*. 535 U.S. at 451 (Kennedy, J., concurring in the judgment). The question presented by the City's motion to dismiss is whether plaintiffs have adequately alleged that this evidence, despite its

22

volume, consists of "shoddy data or reasoning" or otherwise does not "fairly support [the City's] rationale for its ordinance." *Id.* at 438 (plurality opinion). The Court concludes that they have not.

First, the Amended Complaint alleges that the City did not present any "reliable" evidence of adverse secondary effects before enacting the 2010 Ordinance. Am. Compl. ¶¶ 27, 30. Without more, such conclusory allegations do not satisfy the requirements of *Twombly* and *Iqbal*. Under these decisions, plaintiffs must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555. They must set forth factual allegations "plausibly suggesting" a violation of the law. *Id*. at 557; *see also Iqbal*, 129 S. Ct. at 1950 (complaint must "permit the court to infer more than the mere possibility of misconduct"). Merely alleging that the evidence on which the City relied was not reliable does not satisfy this requirement. In light of the varied and voluminous evidence of adverse secondary effects cited by the City in adopting the ordinance, plaintiffs must at the very least allege some facts supporting their contention that this evidence was not reliable. This they have failed to do.[9]

---

[9] Like the Amended Complaint, plaintiffs' proposed Second Amended Complaint also contains nothing but conclusory allegations that the City's evidence was not reliable. *See*
(continued...)

Second, plaintiffs allege that the City improperly relied on evidence from other, dissimilar jurisdictions.  Am. Compl. ¶¶ 34, 35.  However, there is nothing improper in the City's relying on evidence from other jurisdictions.  It is well-settled that a city may reasonably rely on "evidence gathered by other localities." *Daytona Grand*, 490 F.3d at 875 (quoting *Peek-A-Boo I*, 337 F.3d at 1268).

Third, plaintiffs allege that the City failed to obtain studies of secondary effects within the City of Forest Park.  Am. Compl. ¶ 37.  As noted above, however, there is no requirement that the City conduct its own empirical studies. "[A] city need not 'conduct new studies or produce evidence independent of that already generated by other cities.'"  *Daytona Grand*, 490 F.3d at 875 (quoting *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring in the judgment)).

Finally, plaintiffs allege that the City ignored valid empirical evidence of the absence of negative secondary effects associated with plaintiffs' adult entertainment establishments.  Am. Compl. ¶ 36.  Plaintiffs do not identify this alleged evidence, but even assuming the existence of such evidence, there is no

---

[9](...continued)
Second Am. Compl. ¶¶ 34-35, 38, 41-42, 88, 95.  The closest plaintiffs come in either complaint to  alleging facts challenging the reliability of the City's evidence are allegations that City officials stated that there were fewer problems at plaintiffs' clubs than at some fast food restaurants and that the City had a "good relationship" with plaintiffs.  Am. Compl. ¶ 36; Second Am. Compl. ¶ 24.

requirement that the City accept it and disregard other relevant evidence of adverse secondary effects. At most, the existence of such evidence would show that "the City *could* have reached a different conclusion during its legislative process about the relationship between adult [entertainment establishments] and negative secondary effects." *Daytona Grand*, 490 F.3d at 881 (emphasis in original). "But demonstrating the possibility of such an alternative does not necessarily mean that the City was barred from reaching other reasonable and different conclusions." *Id.*; *see also Alameda Books*, 535 U.S. at 451-52 ("[C]ourts should not be in the business of second-guessing fact-bound empirical assessments of city planners. The . . . City Council knows the streets of [the City] better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion.") (Kennedy, J., concurring in the judgment) (citations omitted).

The Court concludes that the Amended Complaint fails to allege facts "plausibly suggesting" that the 2010 Ordinance violates *O'Brien*'s second prong. Other than the conclusory allegation that the evidence on which the City relied was not "reliable," the Amended Complaint does not contain a single factual allegation suggesting that the evidence was based on "shoddy data or reasoning" or that it did

25

not "fairly support" the City's rationale for the 2010 Ordinance. Instead, plaintiffs merely allege that the City considered studies from other jurisdictions, did not perform its own local studies, and did not accept local evidence of the absence of adverse secondary effects – all of which is perfectly legitimate and has been expressly upheld in prior controlling decisions. This is simply not enough to state a plausible claim that the 2010 Ordinance does not further the City's substantial interest in curbing the adverse secondary effects of adult entertainment establishments.

Since plaintiffs have failed to state a claim for violation of *O'Brien*'s second prong, the *Alameda Books* burden-shifting scheme does not come into play.[10] To conclude otherwise would eviscerate the pleading requirements of *Twombly* and *Iqbal* in cases challenging adult entertainment ordinances and would grant plaintiffs the right to discovery regardless of whether they had satisfied these threshold requirements. Plaintiffs in such cases could demand potentially burdensome discovery, including depositions of city council members and other

---

[10] Although the Court applied the *Alameda Books* burden-shifting analysis at the preliminary injunction stage, this does not preclude revisiting the issue at the motion to dismiss stage. *See Sensations, Inc. v. City of Grand Rapids*, Nos. 1:06-CV-300, 4:06-CV-60, 2006 WL 5779504 (W.D. Mich. Oct. 23, 2006), *aff'd*, 526 F.3d 291 (6th Cir. 2008) (granting motion for judgment on the pleadings after applying *Alameda Books* burden-shifting analysis to motion for preliminary injunction).

city officials,[11] merely by alleging in conclusory fashion – as plaintiffs have here – that the evidence of secondary effects on which the municipality relied in enacting the ordinance was "not reliable."  More is required of plaintiffs to move beyond the pleading stage and obtain discovery.  The Amended Complaint in this case falls well short of what is required.

Furthermore, even if the Amended Complaint adequately alleged a violation of *O'Brien*'s second prong, the evidence attached to the City's motion to dismiss is sufficient to conclusively establish the City's compliance with this requirement without resorting to the *Alameda Books* burden-shifting analysis.  This evidence included judicial decisions of the Supreme Court and the Eleventh Circuit upholding restrictions virtually identical to those challenged here on the basis of virtually identical supporting facts.[12]  Based on these decisions and the other evidence presented, the City found that adult entertainment establishments "lend themselves to ancillary unlawful and unhealthy activities" and "escalate and

---

[11] Plaintiffs in this case have already filed a motion seeking leave of court to take a total of *thirty-six* depositions.  The Court denied the motion pending a ruling on defendants' motions to dismiss.  Order of Oct. 7, 2010, at 2.

[12] The evidence on which the City relied included copies of a number of Supreme Court and Eleventh Circuit decisions, as well as other materials reviewing cases involving adult entertainment ordinances.  *See* Mot. to Dismiss, Ex. A.

exacerbate undesirable community conditions, including but not limited to blight, diminished property values, increased need for law enforcement and emergency medical response resources, and increased burden on the judicial system as a result of the criminal behavior which . . . such business establishments bring to a community."  2010 Ordinance § 9-12-1.  The City further found that "public nudity (either partial or total) under certain circumstances in establishments offering live nude entertainment or 'adult entertainment,' begets criminal behavior and tends to create undesirable community conditions," and that "the sale, dispensing, or consumption of alcoholic beverages of any kind in an adult entertainment establishment as defined herein tends to independently create, aggravate, exacerbate, and add to all of those negative secondary effects set forth in this section." *Id.*

Each of these findings has been approved in the cases relied on by the City, and the supporting factual records of those cases have been recognized as supporting the identified secondary effects and that curbing such effects constitutes a substantial governmental interest. *See, e.g., City of Erie v. Pap's A.M.*, 529 U.S. 277, 290 (2000) (city's finding that "nude live entertainment adversely impacts . . . the public health, safety and welfare by providing an atmosphere conducive to

28

violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleterious effects" established legitimate governmental interest that was furthered by ordinance prohibiting public nudity); *Daytona Grand*, 490 F.3d at 876 (city's finding that "actual and simulated nudity and sexual conduct and the depiction thereof coupled with alcohol in public places begets undesirable behavior, that sexual, lewd, lascivious, and salacious conduct among patrons and employees within establishments dealing in alcoholic beverages results in violation of law and dangers to the health, safety and welfare of the public" established legitimate governmental interest that was furthered by ordinance prohibiting nudity and sexual conduct in establishments that serve alcohol).

In addition, cases on which the City relied have upheld prohibitions virtually identical to the provisions challenged by plaintiffs in this case. *See Pap's A.M.*, 529 U.S. at 301 (2000) (upholding prohibition on nudity); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571-72 (1991) (same); *Daytona Grand*, 490 F.3d at 886 (upholding prohibition on nudity where alcohol is served); *Artistic Entm't, Inc. v. City of Warner Robins*, 223 F.3d 1306, 1309 (11th Cir. 2000) ("*Artistic I*")

29

(upholding prohibition on alcohol at adult businesses).[13]  To permit plaintiffs to

challenge these provisions and the findings underlying them using the *Alameda*

*Books* burden-shifting analysis "would directly undermine both the right of

municipalities to rely upon studies and decisions from other jurisdictions and the

fundamental rule of *stare decisis*." *Sensations*, 2006 WL 5779504, at *7.  "Where,

as here, the local ordinance is based on controlling cases finding evidence of

secondary effects and approving identical restrictions, discovery may not properly

be used to undermine the conclusion reached by those controlling courts."  *Id*. at

*8.

### c.  Unrelated to Content of Speech

The third prong of the *O'Brien* test requires the ordinance to be unrelated to

the suppression of free expression.  This prong is also clearly met.   Both the

Eleventh Circuit "and the Supreme Court have expressly held that an ordinance

focusing on the secondary effects associated with the combination of nude dancing

and alcohol consumption is unrelated to the suppression of free expression."

---

[13] More recent Eleventh Circuit decisions have also upheld virtually identical provisions against challenges under *O'Brien*'s second prong.  *See Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla.,* 630 F.3d 1346, 1355-61 (11th Cir. 2011) ("*Peek-A-Boo II*") (upholding ordinance prohibiting both nudity and alcohol in sexually oriented businesses); *Flanigan's II*, 596 F.3d at 1278-83 (upholding ordinance prohibiting sale, possession, or consumption of alcohol in adult entertainment establishments).

AO 72A
(Rev.8/82)

*Flanigan's I*, 242 F.3d at 984.  The 2010 Ordinance focuses on the negative secondary effects of alcohol and live nude dancing.  Moreover, the ordinance expressly disavows any intent to infringe upon constitutionally protected rights of free expression.  "The ordinance is, therefore, unrelated to the suppression of free expression."  *Flanigan's II*, 596 F.3d at 1278.

### d.  Narrowly Tailored

Finally, under the fourth prong of the *O'Brien* test, the ordinance must restrict First Amendment freedoms no greater than necessary to further the government's interest.  "The Supreme Court has made clear, however, that *O'Brien* does not impose strict scrutiny's familiar 'least restrictive means' requirement." *Daytona Grand*, 490 F.3d at 885.  "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id*. (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989)).  This requirement is clearly met in this case.  Prohibitions on alcohol and nudity have both been previously upheld under the fourth prong of *O'Brien*.  *See Flanigan's II*, 596 F.3d at 1278 (upholding prohibition on alcohol); *Daytona Grand*, 490 F.3d at 885-86 (upholding prohibition on nudity).  Plaintiffs cite no authority for their contention

31

that it is only the *combination* of alcohol and nudity that may be prohibited or that any of the other provisions of the ordinance are not sufficiently narrowly tailored to satisfy *O'Brien*'s fourth prong.[14]

### 3.    Alternative Avenues of Communication

Plaintiffs allege that the 2010 Ordinance "fail[s] to provide for adequate alternative avenues of communication for sexually oriented expression" and "will result in the elimination of the City's only adult entertainment businesses without offering them a viable option to relocate."  Am. Compl. ¶ 43(a)-(b).  The First Amendment requires that an adult entertainment ordinance "allow[] for reasonable

---

[14] In addition to the prohibitions on nudity and alcohol, the Amended Complaint cites provisions of the 2010 Ordinance prohibiting entertainers from performing closer than four feet to a patron and requiring that employee permits be worn so as to be readily visible at all times except when an entertainer is actually performing, that all dancing by entertainers occur on a platform raised at least eighteen inches above the floor, that the premises be "fully lighted" at all times patrons are present, and that all entertainment or other interaction between employees and patrons take place in open areas that are open to view from all other areas of the premises. Am. Compl. ¶ 32.  Plaintiffs cite no authority that such provisions are unconstitutional, and similar restrictions have been upheld in other cases.  *See, e.g., N.W. Enters., Inc. v. City of Houston*, 352 F.3d 162, 196-97 (5th Cir. 2003), *modified on rehearing*, 372 F.3d 333, 338 (5th Cir. 2004) (upholding requirement that employees conspicuously display personal identification card while working); *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403 (6th Cir. 1997) (upholding requirement that entertainers perform on platform at least eighteen inches high and stay at least six feet from patrons); *Lady J. Lingerie v. City of Jacksonville*, 176 F.3d 1358, 1365-66 (11th Cir. 1999) (upholding requirement that rooms in adult entertainment establishments be at least 1000 square feet in area); *832 Corp. v. Gloucester Twp.*, 404 F. Supp. 2d 614, 634 (D. N.J. 2005) (upholding requirement that interior of adult entertainment establishments be "adequately lighted and constructed" so that every portion is readily visible to supervisory personnel).

32

alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1986) (citations omitted).  A municipality must "refrain from effectively denying respondents a reasonable opportunity to open and operate an adult [business] within the city." *Id.* at 54.  In addition, "[a] new zoning regime must leave adult businesses with a 'reasonable opportunity to relocate,' and 'the number of sites available for adult businesses under the new zoning regime must be greater than or equal to the number of adult businesses in existence at the time the new zoning regime takes effect.'" *Daytona Grand*, 490 F.3d at 870 (quoting *Fly Fish*, 337 F.3d at 1310-11).

As a threshold matter, plaintiffs fail to allege facts that would support their standing to pursue this claim.  There is no allegation that the 2010 Ordinance prevents plaintiffs from continuing to operate at their current locations, nor do plaintiffs allege that they have sought to open adult entertainment establishments at other locations within the City but have been prevented from doing so by the 2010 Ordinance.  Thus, plaintiffs have failed to allege an "injury in fact" and therefore lack standing to challenge the 2010 Ordinance on these grounds.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-36 (1990), *overruled in part on other grounds by City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004) (no

33

party had standing to challenge provisions of adult entertainment ordinance because none had been injured by the provisions); *Lady J. Lingerie*, 176 F.3d at 1366 (same); *see also CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1274 (11th Cir. 2006) (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972) (plaintiff "'must show that [it] has sustained or is immediately in danger of sustaining a direct injury as the result of' each provision in the [challenged ordinance]").

Even if they had standing, plaintiffs fail to allege any facts to support this claim. As noted above, there is no allegation that the 2010 Ordinance impacts plaintiffs' ability to continue operating at their current locations or their ability to expand or relocate to other locations within the City. Indeed, a comparison of the 2010 Ordinance with the 2009 Ordinance shows that the current ordinance is actually *less* restrictive insofar as it allows adult entertainment establishments to be located 1000 feet apart rather than 1500 feet apart. *Compare* 2010 Ordinance § 9-12-6(a)(3) *with* 2009 Ordinance § 9-12-6(a)(3), Am. Compl., Exs. C and F. An ordinance passed in 1997 ("1997 Ordinance") was even more restrictive. *See* 1997 Ordinance § 9-12-12, Am. Compl., Ex. A.

34

To the extent that plaintiffs claim the ordinance's ban on nudity leaves them without alternative avenues of erotic expression, their claim is also without merit. The 2010 Ordinance does not prohibit erotic dancing. It only prohibits totally nude dancing. The ordinance permits dancers to appear in what are commonly known as pasties and G-strings. 2010 Ordinance § 9-12-6(f). The Supreme Court has specifically upheld such restrictions. *See Pap's A.M.*, 529 U.S. at 294 (where ordinance permitted dancers at adult entertainment establishments to perform wearing pasties and G-strings, "[a]ny effect on the overall expression is *de minimis*"); *Barnes*, 501 U.S. at 571 ("the requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic").

### 4.   Unbridled Discretion

The Amended Complaint alleges that the 2010 Ordinance imposes an unconstitutional prior restraint by granting the City "unrestrained discretion" to discriminate against speech based on its content. Am. Compl. ¶ 43(d). This claim is apparently based on plaintiffs' allegation that Sections 9-12-3(a) and 9-12-6(b)(2) of the ordinance "[s]ubject[] applicants to a subjective licensing and permitting process before an adult entertainment license can be issued to a business

35

and before an adult entertainment permit can be issued to an employee or independent contractor."  Am. Compl. ¶ 32(f).

"The Supreme Court has 'long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license.'" *CAMP*, 451 F.3d at 1274 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988)).  Since there is no dispute that plaintiffs are subject to the licensing and permitting provisions of the 2010 Ordinance, they have standing to challenge those provisions facially on the grounds that they grant City officials unbridled discretion.[15]

_____

[15] The City argues that, apart from a facial challenge for unbridled discretion, plaintiffs lack standing to challenge any of the ordinance's licensing provisions because "plaintiffs possess adult entertainment licenses, have always been granted such licenses, and have not been threatened with revocation of those licenses."  City's Reply Br. at 5.  In response to this argument, plaintiffs move to supplement their response to the City's motion to dismiss with two letters dated December 22, 2010, from the chief of police denying plaintiffs' applications for renewal of their licenses for 2011.  The City contends that these denials are irrelevant because they were not based on the ordinance's licensing requirements but on the existence of private rooms or booths in plaintiffs' establishments in violation of a non-licensing provision in the ordinance.  The Court agrees that denial of a license based on violation of a non-licensing provision would not confer standing to challenge the ordinance's licensing provisions.  This dispute is irrelevant, however, because the Court does not read the Amended Complaint as asserting any challenge to the ordinance's licensing provisions apart from a facial challenge based on alleged unbridled discretion.  Accordingly, the Court denies as moot plaintiffs' motion

(continued...)

"[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Fly Fish,* 337 F.3d at 1313 (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969)). "[S]ome measure of discretion is acceptable, but . . . virtually any amount of discretion beyond the merely ministerial is suspect." *Id.* (quoting *Lady J. Lingerie*, 176 F.3d at 1362). Thus, to plausibly assert a claim of prior restraint based on unbridled discretion, plaintiffs must allege that the 2010 Ordinance lacks "narrow, objective, and definite standards to guide the licensing authority" and grants City officials discretion going beyond the "merely ministerial."

Section 9-12-3(a) requires anyone operating an adult entertainment establishment to procure an annual license to do so. It does not set out the standards governing the grant or denial of a license. Those standards are contained in another provision of the ordinance, which requires that a license be granted if the application satisfies certain specified conditions. *See* 2010 Ordinance § 9-12-

---

[15](...continued)
to supplement their response to the City's motion to dismiss.

5(d).[16]  Nowhere does the Amended Complaint cite this provision, nor does it contain any allegation as to how the governing standards grant City officials unbridled discretion.

Section 9-12-6(b)(2) requires any employee of an adult entertainment establishment to obtain a permit for employment from the chief of police.  The provision requires issuance of the permit if the applicant meets certain specified requirements and pays the permit fee.  The requirements for obtaining a permit are set out in another subsection, which states that employees must be at least 18 years of age and not have been convicted of certain specified criminal offenses in the past five years.  *See* 2010 Ordinance § 9-12-6(b)(1).  Nowhere does the Amended Complaint cite this provision, nor does it contain any allegation as to how these requirements grant City officials unbridled discretion.

The Court concludes that the Amended Complaint fails to plausibly allege that either of these provisions operates as an unconstitutional prior restraint by

---

[16] The application must be granted if (1) the application fee has been paid; (2) the application contains all required information and no material misrepresentations; (3) the applicant, owners, and operators have not been convicted of certain specified crimes in the last 10 years; (4) the applicant, owners, and operators have not had a license revoked in the last 5 years; (5) the proposed premises are in compliance with all applicable laws; (6) the applicant, owners, and operators are all at least 18 years of age; (7) the proposed premises satisfy the minimum distance requirements set out in the ordinance; and (8) granting the license will not violate any state or federal law.

granting City officials unbridled discretion.  On its face, the ordinance contains "narrow, objective, and definite standards to guide the licensing authority" in determining whether to grant or deny a license or a permit and does not grant City officials discretion going beyond the "merely ministerial."  *Fly Fish,* 337 F.3d at 1313.  Absent any allegation by plaintiffs as to how the specified provisions of the 2010 Ordinance grant City officials unbridled discretion, the Amended Complaint fails to state a plausible claim based on these provisions.

The Amended Complaint also alleges that the 2010 Ordinance imposes an unconstitutional prior restraint on protected speech by requiring employees and independent contractors of adult entertainment establishments to pay "unspecified" employee permit fees.  Am. Compl. ¶ 43(c).  Plaintiffs argue that the employee permit fee is unconstitutional because the ordinance does not specify the amount of the fee or set forth explicit standards for determining the amount.

The Eleventh Circuit has recognized that "when First Amendment freedoms are made subject to a licensing scheme, only revenue-neutral fees may be imposed so that government is not charging for the privilege of exercising a constitutional right."  *Fly Fish*, 337 F.3d at 1314 (citations omitted).  Accordingly, such fees

39

"must be reasonably related to recouping the costs of administering the licensing program." *Id.* at 1315.

The 2010 Ordinance expressly requires that employee permit fees "be in an amount which is reasonably tied to the costs of investigating the employee's record and background." 2010 Ordinance § 9-12-6(b)(4). The Court concludes that the ordinance adequately limits the discretion of the City with respect to the setting of the employee permit fee by requiring that the fee be reasonably related to the City's costs. Thus, plaintiffs fail to plausibly allege that the employee permit fee constitutes an unconstitutional prior restraint.

In their response to the City's motion to dismiss, plaintiffs identify several other provisions of the 2010 Ordinance that they argue grant City officials unbridled discretion. Pls.' Resp. Br. at 12-18. Plaintiffs first cite provisions (1) requiring employee records to be open for inspection by police during normal operating hours, Section 9-12-6(j); (2) authorizing police to inspect adult entertainment establishments any time they are occupied by one or more persons in order to determine compliance with and enforce applicable law, Section 9-12-10(c); and (3) authorizing the suspension or revocation of a license for violation of any of the regulations or prohibitions contained in the ordinance, Section 9-12-

11(a)(2).  Pls.' Resp. Br. at 12-13.  Plaintiffs contend that these provisions are overbroad, grant the police too much discretion, and violate their Fourth Amendment rights.  Plaintiffs, however, cite no authority supporting these contentions, and other cases have upheld similar provisions. *See, e.g., Free Speech Coalition, Inc. v. Holder*, 729 F. Supp. 2d 691, 751-57 (E.D. Pa. 2010) (upholding statute authorizing inspection "during normal business hours" of records required to be maintained by producers of sexually explicit materials); *Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty., Kan.*, 492 F.3d 1164, 1178-79 (10th Cir. 2007) (upholding ordinance provision permitting police inspection of public areas of sexually oriented business during times business "is occupied by patrons or is open to the public"); *F/W PBS, Inc. v. City of Dallas*, 837 F.2d 1298, 1306 (5th Cir. 1988), *aff'd in part, rev'd in part, and vacated in part on other grounds*, 493 U.S. 227 (1990) (upholding ordinance provision permitting inspection of licensed adult business "whenever the premises are occupied or open for business"); *Enlightened Reading, Inc. v. Jackson Cnty., Mo.*, No. 08-0209-CV-W-FJG, 2009 WL 792492 at *6 (W.D. Mo. Mar. 24, 2009) (upholding ordinance provision permitting suspension or revocation of license "if the licensee knowingly

41

violates the ordinance"). The Court concludes that plaintiffs fail to plausibly allege a constitutional violation based on these provisions of the 2010 Ordinance.

Next, plaintiffs contend that the ordinance operates as an unconstitutional prior restraint because it fails to provide an adequate time limit on the City's review of license applications. Pls.' Resp. Br. at 13-15. Plaintiffs acknowledge that Section 9-12-5(d) requires the chief of police to approve or deny license applications within 30 days of receipt, but they argue that there is no time limit on other City officials who must provide input before a license can be approved, and that the ordinance does not provide for automatic approval if the City fails to act within the 30-day time limit. Contrary to plaintiffs' argument, the 2010 Ordinance clearly provides for automatic approval of a license application if it is held without decision for more than 30 days. 2010 Ordinance § 9-12-11(b). In that event, the license application is deemed approved, expressive conduct may begin immediately, and the City must issue the license within three business days. *Id.* Thus, the ordinance clearly satisfies the constitutional requirement for an adequate time limit on the review of license applications. *See Artistic I*, 223 F.3d at 1311.

Finally, plaintiffs argue that, like the employee permit fee, the license application fee and the annual regulatory fee charged under the 2010 Ordinance are

42

unconstitutional because the ordinance does not specify the amount of the fees or set forth explicit standards for determining such amounts. Pls.' Resp. Br. at 15-18. As noted above, to be constitutional, such fees "must be reasonably related to recouping the costs of administering the licensing program." *Fly Fish*, 337 F.3d at 1315.

Like the employee permit fee, the ordinance provides that both the license application fee and the annual regulatory fee are to be "in an amount established by the city's governing body." 2010 Ordinance §§ 9-12-3(b), 9-12-5(a). The ordinance further provides that the license application fee is "to defray, in part, the cost of investigation and report" required by the ordinance.[17] *Id.* § 9-12-5(a). The Court concludes that, on its face, the 2010 Ordinance adequately limits the discretion of the City with respect to the setting of the license application fee by requiring that it be reasonably related to the City's costs. Thus, plaintiffs fail to plausibly allege an unbridled discretion claim based on the license application fee.

---

[17] Contrary to plaintiffs's suggestion, *see* Pls.' Resp. Br. at 17 n.5, the language of this provision clearly indicates that the application fee is intended to cover only part of the City's cost of investigating prospective licensees, not that only part of the fee is to be used to defray such cost.

43

The same cannot be said, however, of the annual regulatory fee.  The ordinance lacks any standards to guide the City's governing body in setting the amount of the annual regulatory fee and thus leaves open the possibility that this fee may exceed an amount "reasonably related to recouping the costs of administering the licensing program." *Fly Fish*, 337 F.3d at 1315; *see also Forsyth Cnty. v. The Nationalist Movement*, 505 U.S. 123, 132-33 (1992) (ordinance that imposes fee upon exercise of First Amendment right must contain "narrowly drawn, reasonable, and definite standards" to guide the governmental agent setting the fee).  The Court concludes that plaintiffs have plausibly alleged that the ordinance provisions imposing an unspecified annual regulatory fee on adult entertainment establishments in an amount to be determined by the City's governing body grants the City unbridled discretion and thus constitutes an unconstitutional prior restraint.

D.    Procedural Due Process Claims

Plaintiffs contend that the 2010 Ordinance infringes their federal procedural due process rights because the provisions concerning the physical layout of adult entertainment establishments will require them to incur significant expense to renovate their buildings.  Pls.' Resp. Br. at 19-20.  In order to make out a federal

44

procedural due process violation, plaintiffs must first establish "a deprivation of a constitutionally protected liberty or property interest."  *Foxy Lady, Inc. v. City of Atlanta*, 347 F.3d 1232, 1236 (11th Cir. 2003) (quoting *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)).  Plaintiffs claim to have such a vested property interest under Georgia law based on cases holding that the issuance of a building permit vests in the owner the right to use the property as permitted by the building permit, and that the permit "may not be revoked by the zoning authority because the property is subsequently zoned against the type building sought to be erected." *Clark v. Int'l Horizons, Inc.*, 243 Ga. 63, 65 (1979) (quoting *Keenan v. Acker*, 226 Ga. 896, 898 (1970)).

These cases do not suggest, however, that owners of adult entertainment establishments, in order to renew their business licenses, cannot be required to make physical changes to existing buildings to bring them into compliance with new regulations governing such establishments.  The Georgia Supreme Court, drawing a distinction between a building permit and a business license, has held that holders of adult entertainment licenses do not have "a vested right to remain in business under the licensing regulations in existence at the time [they] received their initial licensing." *Goldrush II v. City of Marietta*, 267 Ga. 683, 698 (1997).

45

Thus, plaintiffs have no vested right to continue to operate their businesses in accordance with previously existing regulations, and the fact that they may incur some expense in bringing their buildings into compliance with the 2010 Ordinance does not deprive them of any protected property interest.

Even if plaintiffs had a vested property right in their adult entertainment licenses, they have failed to allege facts supporting a claim that they were deprived of procedural due process. "Due process of law requires notice and an opportunity for some kind of hearing prior to the deprivation of a significant property interest." *Flanigan's I*, 242 F.3d at 987 (citation omitted). In this case, the pleadings demonstrate that plaintiffs were provided ample notice of the City's contemplated adoption of a new adult entertainment ordinance and an opportunity to be heard. Plaintiffs allege that the Forest Park City Council conducted meetings on July 21, 2009, and March 8, 2010, focusing on the secondary effects of adult entertainment establishments and the proposed new ordinance. Am. Compl. ¶¶ 26-27, 29. The record shows that plaintiffs were represented by counsel at both of those meetings and presented testimony. Mot. to Dismiss, Ex. B; Am. Compl., Ex. E. Thus, plaintiffs' claim of a lack of procedural due process fails as a matter of law. *See Flanigan's I*, 242 F.3d at 987-88 & n.17.

46

Plaintiffs also contend that the 2010 Ordinance violates Georgia procedural due process guarantees because it includes zoning provisions but was not enacted in accordance with Georgia's Zoning Procedures Law, O.C.G.A. § 36-66-1 *et seq.* Pls.' Resp. Br. at 20.  This argument is also without merit.  "Not every ordinance regulating the use of land constitutes a zoning ordinance." *Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1204 (11th Cir. 2003) ("*Artistic II*").  "The presence of lot size requirements or space restrictions does not transform a local licensing or regulatory ordinance into one governed by a zoning procedures statute where it is clear from a reading of the ordinance as a whole that it is intended to regulate a particular occupation, rather than to regulate the general uses of land." *Id*. at 1205 (quoting *Fairfax MK, Inc. v. City of Clarkston*, 274 Ga. 520, 521-22 (2001)) (internal quotation marks and citations omitted).  "Rather than regulating 'general uses of land,' the [2010] Ordinance regulates a particular type of activity – adult entertainment.  As such, the [2010] Ordinance . . . is not a zoning ordinance and is not subject to the . . . requirements established under the Zoning Procedures Law . . . ." *Id*.  Accordingly, plaintiffs have failed to allege a procedural due process violation under Georgia law.

   E.   Tortious Interference with Business Relations Claim

47

"To recover for tortious interference with business relations, a plaintiff must establish that the defendant: '(1) acted improperly and without privilege; (2) acted purposely and with malice with the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with [the plaintiff]; and (4) caused [the plaintiff] financial injury.'" *Cox v. City of Atlanta*, 266 Ga. App. 329, 332 (2004) (quoting *Janet Ricker Builder, Inc. v. Gardner*, 244 Ga. App. 753, 755 (2000)). In this case, plaintiffs base their tortious interference claim upon the allegation that they have a "vested right" in continuing to operate as adult entertainment establishments and a legitimate "expectation" that the City will renew their alcohol and adult entertainment licenses, on the basis of which they have "entered into long-term lease and vendor agreements and invested substantial amounts of time, effort, and money toward developing and maintaining their businesses for the exclusive land use of adult entertainment." Am. Compl. ¶ 54. Presumably, it is on the basis of this allegation that plaintiffs contend the City acted "improperly and without privilege" in enacting the 2010 Ordinance.

As noted above, however, under Georgia law, plaintiffs have no "vested right to remain in business under the licensing regulations in existence at the time [they] received their initial licensing" and thus no legitimate expectation that their

48

licenses will be renewed if they fail to comply with newly enacted regulations. *Goldrush II*, 267 Ga. at 698.  It does not matter that plaintiffs have invested substantial amounts of time, effort, and money in their businesses.  "Those who hold licenses that expire annually act at their peril and assume the risk that their licenses might not be renewed notwithstanding they have 'committed their lives and their capital to building their businesses' which need licenses to operate." *Id.* (quoting *Ficarra v. Dept. of Regulatory Agencies*, 849 P.2d 6, 18 (Colo. 1993)). Moreover, as discussed above, a municipality may properly regulate adult entertainment establishments based on evidence that such regulations will further the substantial governmental interest in curbing the negative secondary effects associated with such establishments.  In this case, the City has presented a voluminous amount of such evidence, and plaintiffs have failed to plausibly allege that it does not support the City's rationale.  Accordingly, this claim must fail because plaintiffs have not plausibly alleged that the City acted improperly and without privilege in enacting the 2010 Ordinance.

Plaintiffs have also failed to allege any facts suggesting that enactment of the 2010 Ordinance has induced any third party not to enter into or continue a business relationship with plaintiffs.  The Amended Complaint refers to lease and

49

vendor agreements, but there is no allegation that the City's enactment of the 2010 Ordinance has induced these third parties, or any other third party, not to do business with plaintiffs.  If plaintiffs' contention is that they themselves will be forced to terminate lease agreements or vendor relationships because of the economic impact of the ordinance, then this fails to satisfy the requirements for a tortious interference claim.  Plaintiffs must allege that the City has induced some *third person* not to enter into or continue a business relationship with plaintiffs, not that the City has induced plaintiffs to terminate or not enter into such relationships. *See SSDD  Enters., Inc. v. Village of Lansing*, No. 95 C 6064, 1997 WL 176576 at \*10 (N.D. Ill. Apr. 4, 1997) (allegation that enforcement of adult entertainment ordinance would force plaintiffs to breach their lease did not state a tortious interference claim).  Accordingly, this claim must also fail because plaintiffs have not plausibly alleged that the City's enactment of the 2010 Ordinance induced any third party not to enter into or continue a business relationship with plaintiffs.[18]

---

[18] Since all of plaintiffs' state law claims have either been abandoned or must be dismissed on other grounds, the Court finds it unnecessary to address the City's argument that these claims are also subject to dismissal because plaintiffs failed to provide the required *ante litem* notice under O.C.G.A. § 36-33-5.

Summary

For the foregoing reasons, the Court GRANTS the individual defendants' motion to dismiss [79], GRANTS IN PART AND DENIES IN PART the City of Forest Park's motion to dismiss [80], GRANTS defendants' motion to strike plaintiffs' Second Amended Complaint [101], DENIES plaintiffs' motion for leave to file an amended complaint [106], and DENIES AS MOOT plaintiffs' motion to supplement their response to defendants' motion to dismiss [124].  As a result, plaintiffs' Second Amended Complaint [90] is STRICKEN from the record, all claims against the individual defendants are DISMISSED, and all claims against the City of Forest Park are DISMISSED except the claim that the annual regulatory fee established by the 2010 Ordinance operates as an unconstitutional prior restraint by granting the City unbridled discretion in setting the amount of the fee. Finally, within ten (10) days of the date of entry of this order, the Court DIRECTS counsel for the parties to contact Courtroom Deputy Clerk Amy McConochie (404-215-1437) to schedule a status conference at which the Court will address remaining issues, including defendants' recently filed supplemental motion to dismiss.

51

IT IS SO ORDERED, this 26th day of May, 2011.

Amy Totenberg
United States District Judge

AO 72A
(Rev.8/82)